IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIS MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-4887 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| IHC CONSTRUCTION COMPANIES, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Willis Myers ("Plaintiff" or "Myers") brings suit against Defendant IHC Construction Companies, LLC ("Defendant" or "IHC") for race discrimination and retaliation in violation of 42 U.S.C. § 1981. Currently before the Court is Defendant's motion for summary judgment [73]. For the following reasons, Defendant's motion [73] is denied. This case is set for a telephonic status hearing on April 14, 2021 at 9:45 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

I.      Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits. See [74], [93], [94], [101]. The facts are undisputed unless otherwise indicated. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. The events giving rise to Plaintiff's complaint occurred within this judicial district.

Plaintiff, who is African American, is a fourth-generation construction worker. His experience in construction began in seventh grade, when he would assist his father on construction projects. Plaintiff became a union laborer and was hired as a concrete laborer at A&L Skyway.

Over the years, Plaintiff has worked various union construction jobs, where he has performed a wide range of tasks including pouring concrete.

Defendant IHC provides full-service General Contracting, Construction Management, Design/Build, and Underground Utility Construction to the Chicagoland and Northern Illinois markets. IHC's headquarters are in Elgin. IHC employed 309 employees as of July 7, 2016. Due to the completion of several projects, as of May 15, 2017, IHC had 226 employees.

IHC hired Plaintiff as a union laborer in August 2015. His superintendent was Terry Hill ("Hill"). Plaintiff was initially hired because Hill confused Plaintiff with another Black construction worker named "Will." [101] at 2. Laborers like Plaintiff had different qualifications and skills and performed different functions than individuals with other job titles, such as carpenters and concrete finishers. Although they disagree on the particulars, it is generally undisputed that Plaintiff is a skilled worker who is effective at his job. See *id.* at 5.

IHC describes itself an "equal employment opportunity employer," that "regularly reminds its employees of this fact and how to report any alleged discrimination." [93] at 2. Plaintiff disputes this, explaining that Defendant's evidence consists of only three documents spanning three years. See *id.* at 3. Plaintiff further points out that IHC is led by an all-white leadership team, "lacks any policies or programs aimed at retaining minority employees," and allegedly has "an atrocious record of hiring and retaining African American employees." *Id.* at 2. In particular, Plaintiff cites to evidence that when he was hired in 2015, only 15 of 242 IHC employees were African American (6.2%), and IHC had 0 African American executives, 0 African American "first officials or managers," and 0 African American "professionals" in its ranks. *Id.* By 2017 (after the workforce decreased due to lack of work), two of IHC's 151 employees were African American (1.32%); both were laborers. See *id.*; see also [94-49] at 2.

2

Plaintiff started working for IHC in August 2015.  He was employed on what was known as a "Tunnel Crew" building tunnels in Stickney, Illinois.  His employment at the Stickney project ended in August 2016.  The Tunnel Crew worked on three structures simultaneously, alternating between building the floors, walls and ceilings.

Plaintiff testified that around June 23, 2016, the Stickney tunnel work was "coming to an end."  [93] at 7.  According to Plaintiff, he had several conversations with IHC foremen and his superintendent Hill about IHC's plans for his employment after the tunnel project wound down. In every one of those conversations, Plaintiff declares, he was informed that he would be moved to another project at Stickney once the tunnel work was completed.  See *id.* at 7-8.  For example, according to Plaintiff, Hill told him that once the tunnel work wound down, "you're not going anywhere, you're too valuable."  *Id*. at 8.  (Defendant does not deny this, see [101] at 5.)  Further, Plaintiff states, his foreman Johnson informed him that, once the tunnel work was completed, Plaintiff would be transferred to the tank crew at Stickney, to work under a carpenter named Pat. [93] at 8.  (Johnson and Defendant deny this.  See [101] at 5.)

This case centers around an incident that occurred on July 22, 2016.  Plaintiff testified that, prior to that date, he experienced the following incidences of racial harassment while employed at IHC, see [74] at 16-18, [101] at 5-8:

a. In September 2015, during the beginning of Plaintiff's employment at IHC, various ironworkers would play "an NWA song 'straight outta compton' all the time and would laugh every time the lyric 'n****' came up."

b. Hill referred to foreman Johnson as "LeBron" rather than by his proper name, LaSean. According to Plaintiff's deposition testimony, Hill told him in December 2015, "you'll be working with LeBron" because "LeBron is trying to keep the coloreds together." Plaintiff told Johnson about the comment because he was concerned that Hill had scheduled black employees together as a set up if something went wrong.

3

c. In late 2015 or early 2016, a fellow laborer, Al Lumpkin ("Lumpkin") (who is African American), told Plaintiff that he had heard a laborer named Kurt say "call the brothers" because they were best for shoveling and sweeping.

d. In January 2016, a white concrete finisher and union steward named Mark Newell ("Newell") made the comment, in Plaintiff's presence, that "LaSean smiles like a nasty coon."

e. On February 22, 2016, "Scotty", "Chris", Plaintiff and another IHC employee were working on a catwalk, which made Plaintiff uncomfortable due to his (known) fear of heights. Scotty stated to Chris, "F*** that black dude, I really want to f*** that black dude." Chris said "play nice with the brotha" and "don't be rude to the black man."

f. In February 2016, Myers was having lunch with a co-worker, Shane, who repeated that he heard another worker refer to a third worker as "n*****-rich."

g. In March 2016, Myers was pouring concrete with "Donnie," who described another black laborer as a "big black gorilla."

h. On April 9, 2016, while Plaintiff was using Hill's truck to transport bags of cement, Hill said "why do these brothers"—or "colored fellas," according to Plaintiff, see [93] at 61—"keep stealing my truck?"

i. In April 2016, Johnson told Plaintiff that an iron worker had called Johnson a "bloody Baluga," an Irish slur for a Black person.

j. At unspecified times, two ironworkers by the names "Patty" and "Moose" would state to Plaintiff "you're my favorite one," which Plaintiff interpreted to be referring to his race.

Plaintiff explains that he sometimes confronted individuals who made racially hostile comments but did not formally complain to higher-level employees at IHC. Although Plaintiff was aware that he could complain about harassment, he explained that he had a fear of being discharged for making a complaint, because "typically, in this industry, to remain employed as a black person, you have to be docile. You have to be subservient. You have to be the type of guy that knows your place, so that means whoever says whatever to you, you have to deal with it." [93] at 64; see also [101] at 9-10. According to Plaintiff, "two black employees made complaints regarding discrimination or harassment during his employment there, and both … were pushed out

4

of the organization and lost their jobs." [93] at 64. The facts surrounding these employees and their terminations are disputed.

On July 22, 2016, Newell—a white concrete finisher and union steward—used the phrase "n****-rigged" in Plaintiff's presence to describe scaffolding that Plaintiff had just finished constructing. [101] at 10. Plaintiff testified that after dealing with racial harassment for a year at the Stickney jobsite, he resolved to speak up. Plaintiff described to Johnson what occurred and what Newell said. Plaintiff also told IHC's safety engineer, Ryan Mankowski, who called Peter Nielsen ("Nielsen"), the project manager and boss of the Stickney worksite. Nielsen called a meeting in the worksite's office trailer. The meeting included Plaintiff, Nielsen, Johnson, and Hill. See [101] at 11.

When Plaintiff arrived at the trailer with Johnson, Nielsen asked him what happened and Plaintiff described "what Mark had said, and that I had grown tired of enduring it because I felt like, one, even though it's a blue-collar industry, we're still supposed to be professional guys. And as professionals, I was clear in how I felt, as professionals, regardless of our politics or our social feelings, we supposed to be professionals and that had no place on the job, and that I had not only heard that but that I had—there were constant examples or instances of some form of racial harassment." [101] at 11-12. Plaintiff described other incidents of perceived racial harassment he had experienced at Stickney.

Hill (Plaintiff's superintendent) responded to Plaintiff by saying that, where he and Newell "come from we use that phrase (n*****-rigged) all the time." [101] at 12. (According to Defendant, Hill "spent his 'childhood' in Sandwich." *Id.*) Plaintiff states that he "was immediately troubled by Hill's comment and thought 'I should be concerned about this guy because if he's using this type of phrase all the time, I'm going to be out the door relatively quickly.'" *Id.* Plaintiff

further states that he understood Hill's comment as a "warning slash threat." *Id*. Plaintiff responded to Hill by explaining that he did not want to be seen a "troublemaker" and pushed out of his job. *Id*. Nielsen replied that "we only push out the bad workers, and I had not heard of [Plaintiff] being a bad worker." *Id*. Hill added that Newell "even requests [Plaintiff] on his [concrete] pours." *Id.* Plaintiff was asked what he wanted the group to do, and he responded that he wanted IHC to do to Newell "what you'd do to me if I violated one of your policies." *Id*.

Plaintiff further states that during the meeting, Johnson "chimed in to press" Hill and Nielsen about not hiring his African American friend Willie Williams ("Williams"), whom he had been trying to get hired for a long time. [101] at 13. (Johnson did not recall bringing up Williams during this conversation. See *id*.) Johnson also mentioned a recent incident in which someone wrote "white power" on an African American employee's worksite at Stickney. See *id*. Plaintiff presents evidence that IHC never investigated, followed up on the incident, or discipline anyone in connection with it. Defendant disputes this and emphasizes that Johnson told management the message had been scraped off and covered up and management told Plaintiff "the incident was not right or acceptable" and asked him and Johnson if they knew who wrote it (they did not). *Id*.

After the meeting, Nielsen emailed Walt Dwyer, IHC's Chief Operating Officer, and Jeff Rausch ("Rausch"), IHC's Vice President of Operations, recounting Plaintiff's complaint of racial harassment and the subsequent conversation in the trailer. Rausch's response included the comment that "[t]his is a social problem that is something we cannot solve without getting rid of people. Not sure that would be the answer." [101] at 18. In a subsequent response on the following Monday morning, July 25, Rausch referred to the term "n*****-rigged" as a "slang phrase that was used." *Id*. He stated that he would "go out there right now and watch the pour and look for

any 'issues'." *Id*. Rausch explained in his deposition that he wanted to make sure everyone was working as a team. *Id*. at 19.

The same morning, Rausch visited the tunnel crew at Stickney. He met with Plaintiff and showed him a copy of IHC's anti-harassment policy, which states that "[s]ubstantiated acts of harassment will be met with appropriate disciplinary action up to and including termination." [101] at 19. Rausch then met with Newell. Newell admitted he used the phrase "n*****-rigged" on the IHC jobsite at Stickney. Rausch did not include this admission in his subsequent write-up of the conversation. [101] at 20. It was Rausch's decision how or whether to discipline Newell, and he felt a "warning" was a "serious enough" response to Newell's conduct. *Id.* Newell suffered no other consequences and remained employed by IHC for more than two additional years. Defendant admits all this, see *id.*, but adds that Newell expressed remorse to Rausch and stated that it would not happen again. Newell also signed a copy of IHC's anti-harassment policy. See *id*. Rausch felt the situation was "handled." *Id*.

Plaintiff declares that on the day Rausch visited, "the tunnel crew was pouring concrete," while "Hill personally assigned [Plaintiff] to do patch work by himself, out of sight of the other workers, instead of pouring concrete." [101] at 20; see also [93] at 19. Defendant disputes this, pointing to IHC daily work reports that show Plaintiff pouring concrete for part of the day and another worker helping Plaintiff with patching for part of the day. See [101] at 20-21.

Plaintiff states in his declaration that the next day, July 26, 2016, his foreman LaSean Johnson pulled him aside. Johnson told Myers to "make certain you come a little early every day because Terry [Hill] and Pete [Nielsen] are watching you." [101] at 21; see also [93] at 56. Plaintiff further states that two days later, on July 28, 2016, Johnson again pulled him aside to tell

him that "what happened is already out," that "[g]uys are making jokes about it," and to "watch out" because the finishers (Newell's job title) "got it out for you." [101] at 21; see also [93] at 58.

It is disputed whether, after Plaintiff complained of racial harassment, Hill refused to assign Plaintiff to perform any further concrete pours, instead assigning him more menial tasks on the Stickney jobsite. See [101] at 21-24; [93] at 19. It is also disputed whether Plaintiff was offered fewer opportunities to work overtime on Saturdays. According to Plaintiff, and daily reports he cites, he "would often be selected to work overtime on dates that only a few laborers were allowed to work overtime" but "[a]fter complaining of racial harassment on July 22, [he] was never again selected to work overtime at Stickney on dates that only a few laborers were allowed to work overtime; rather, white or non-complaining laborers were selected instead." [101] at 25. Defendant disputes this and cites records indicating that Plaintiff worked overtime July 30, August 6, and 13, which were days "not all" laborers worked overtime. *Id*.

In the weeks after Plaintiff made his complaint of racial harassment, IHC added two additional laborers to the tunnel crew who were not on the crew as of July 22, 2016. White laborer John O'Neill was reinstated to the tunnel crew on August 3, 2016 after missing three weeks of work; he had been a member of the tunnel crew since October 2015. Williams (Johnson's friend) also joined the Stickney tunnel crew as an apprentice laborer on August 4. See [101] at 24.

By mid-August 2016, Hill "had made the decision to reduce [his] crew size" and Plaintiff "was part of [his] reduction plan." [101] at 25. It is undisputed that Hill informed Rausch that he intended to lay off Plaintiff unless Rausch had a spot for him. Rausch knew every IHC job and its personnel needs. Rausch knew that Adam Row ("Row") at the I-55 project needed help because they were behind schedule. See [93] at 24; [101] at 27. On August 22, 2016, Plaintiff was informed that he was being transferred away from Stickney to Row's crew at I-55. Plaintiff states

that he "immediately expressed concern to Johnson that IHC was 'doing an Al' on him, referring to Al Lumpkins, an African American laborer on the Stickney crew who had complained of discrimination, been transferred away from Stickney, and then laid off shortly thereafter." [101] at 28. Defendant denies, however, that Lumpkins complained of harassment or discrimination before his employment at IHC ended. See *id.* at 28-29. Plaintiff states that on the same day—his last at Stickney—Hill caught up to him in the parking lot and told him, in a threatening tone: "If you had a problem, you should have talked to me first. You're going to be reporting to Adam Row, at I-55." [101] at 28-29. Defendant denies that Hill said this. See *id*.

Rausch's motivation for transferring Plaintiff is disputed. Plaintiff denies that "Row's short-term need for workers at I-55 was the reason why [Plaintiff], as opposed to any other laborer at Stickney, was transferred to that project." [93] at 23. Rather, Plaintiff contends that "Rausch decided, after accepting without question Hill's desire to 'get rid of' [Plaintiff], to transfer [Plaintiff] in August 2016 away from Stickney—where similarly situated non-African American and non-complaining laborers continued working for many months thereafter—to a temporary assignment at I-55 that was 'nearing completion' and was expected to last a few days at most." *Id.* at 23-24. Plaintiff posits that Rauch "viewed Row's short-term need for a few laborers to 'catch up' on the I-55 project as a fortuitous opportunity to get rid of Plaintiff while creating the fake impression that Plaintiff was being given a real chance to stay employed." *Id*. at 24; see also [101] at 27.

Plaintiff reported to work at I-55 the following day, August 23, 2016. On September 1, Row was laying off laborers. According to Plaintiff, Row informed him that he would have to "sit a couple guys for a week or two," but would "try to keep him until something else pops up" because he was a "good hand." [101] at 30. It is undisputed that Row told Plaintiff that he wanted and

was trying to keep him employed. See [93] at 31-32. Nonetheless, Row did not speak to eight non-African American laborers on his crew about impeding layoffs and they remained working on Row's crew at I-55 for many months. See [101] at 30.

The same day Row told Plaintiff he was going to "sit a couple guys," Row assigned Plaintiff a 17-hour double-shift that lasted until 4 or 5 the following morning. During the night shift, Row assigned Plaintiff the task of drilling anchor bolts while suspended more than 30 feet in the air. [93] at 32. Row gave Plaintiff the following day, September 2, off because it would have been dangerous for him to work after laboring 17 hours the prior day. Plaintiff states that he "began to experience excruciating, debilitating back pain," but Defendant disputes that Plaintiff had immediate back pain or suffered an injury as a result of working at IHC, and claims Plaintiff thought he injured himself sleeping. [101] at 30-31.

On September 5, 2016, Plaintiff sent the following text message to Row: "Adam, Good evening and happy Labor Day. Sorry for the late notice, but after mulling it over all weekend, unless you absolutely need me tomorrow, I'd like to take tomorrow as a vacation day to see my 4 year old off for her first day of school. If that's a problem please call or text me before 5 A.M. tomorrow morning. Sorry for the late notice and thanks in advance." [93] at 33. Row responded that day, "No problem." *Id*.

On September 7, 2016, Plaintiff sent the following text message to Row: "Gm Adam. I apologize again, but I cant make it in today. I some how managed to screw my back up so bad that I can barely move. I'm going to try to make it to the doctor's office. If I do I'll bring in a doctor's statement if necessary. Sorry man. Please don't let these past 2 days impact your decision on who you sit down for a week." [93] at 33. Row responded, "Definitely need a work release form before you come back tomorrow." *Id*. at 34. Defendant contends that Plaintiff then "waited

almost 24 hours to go for the medical release," which Plaintiff disputes, explaining: "Plaintiff arrived at the emergency room 14 hours [after first texting Row]. As Plaintiff explained at his deposition, he initially 'thought that I could just take pain meds and go to work as I have done in other instances, you know, extra-strength Tylenol. As it turns out, that wasn't the case, you know. And when I finally decide to just go ahead and go to the doctor when I was able to get a ride versus trying to catch the bus or try to drive myself, once I was able to get somebody to drive me, I went to the doctor.'" *Id*. Plaintiff was discharged from the emergency room at 5:12 a.m. and texted Row within the next hour: "I have the consent form but I've been instructed to rest my back and return to work on Monday, September 12." [93] at 35.

Plaintiff returned to I-55 on September 12, 2016, with his doctor's statement. Plaintiff learned that he had been laid off, which surprised him. Defendant denies that Plaintiff was surprised, because he "understood that when he would be laid off, there would be no notice until the day of layoff." [101] at 31-32. Defendant asserts that Plaintiff understood himself at this time to be terminated, but Plaintiff denies this. [93] at 35. He points out that his layoff form makes clear that he was laid off due to "lack of work," was "eligible for rehire" and was not terminated involuntarily for "fail[ing] to show for work," "misconduct," "excessive absenteeism," or "fail[ing] to meet employment requirements. *Id*. Further, Plaintiff testified that when he spoke with Row on September 12, Row "assured him that the reason he was being laid off was lack of work, and that he would be brought back in a 'few weeks' in the future when the work picked up." *Id*. at 36. Plaintiff states that he understood that he had been laid off but not permanently terminated and points out that he subsequently sent text messages to Row asking about his "return to work." *Id*. (citing September 28 and 30, 2016 text messages).

According to Plaintiff, the first time anyone at IHC told him that he had been laid off for any reason other than lack of work was in an October 31, 2016 lawyer-drafted letter responding to his October 10, 2016, internal complaint about discrimination, racial harassment, and retaliation. In the letter, IHC asserted for the first time that Plaintiff's "unreliability and absences," rather than simply "lack of work," justified his layoff.  [101] at 32.  The letter extended "IHC's best wishes as you find new employment," making it clear to Plaintiff—for the first time—that his employment at IHC was permanently terminated.  *Id*.  Defendant asserts that Row thought "Plaintiff was not conducting himself like a person anxious to work on his crew" and that "Plaintiff's pattern of calling off close to his start time was suspicious."  *Id*. at 36.  Plaintiff disputes this and explains that he "did not want to miss work," but "was suffering from excruciating back and pelvic pain at the time, which he rated as a 9 out of 10 when he visited the emergency room, and was diagnosed with sciatica."  *Id*. at 37.  As soon as he was medically cleared to work on September 12, 2016, Plaintiff "showed up expecting to work" and "was extremely disappointed to learn that IHC had laid him off."  *Id*. at 38.

It is disputed whether IHC was "shrinking manpower wise" in September 2016, as Defendant asserts.  [93] at 39.  Plaintiff cites to records indicating that the total number of laborers who had been on the tunnel crew at Stickney and remained employed at Stickney remained the same from July 22 to September 26, 2016.  Plaintiff also cites records shows that IHC adding laborers to the I-55 crew in the weeks and months after Plaintiff was terminated.  See *id*. at 40-41. In addition, Plaintiff emphasizes that six of the seven laborers besides him who were on his crew at Stickney on the day he complained of racial harassment on July 22, 2016 were still employed at Stickney as of September 26, 2016 and for months after.  See [101] at 33.

It is disputed who had the ultimate authority to lay off Plaintiff. Defendant points to Row, but Plaintiff cites discovery materials indicating that Rausch made the final decision regarding layoffs. See [93] at 39. Regardless, Defendant admits that "no field personnel employment ends without Mr. Rausch's approval, which could include separation from IHC if it has no place to transfer the individual selected for layoff by the superintendent" and that while superintendents decide which employees to recall from layoff, Rausch "is informed and can approve the individual." [101] at 17. Plaintiff states that Defendant has no policies governing layoff, transfer, or callback decisions; Defendant denies this and says that its "policy is that it cannot discriminate in such manners." *Id.*

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the

nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted). It "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III.   Analysis

In his governing complaint [1], Plaintiff brings claims for race discrimination (Count I) and retaliation (Count II), both in violation of 42 U.S.C. § 1981. Defendant moves for summary judgment on both claims, arguing that "Plaintiff bases his claims on factual misstatements, speculation, hearsay and conspiracy theories." [75] at 1. According to Defendant, "[a]t every turn, IHC treated Plaintiff more favorably than similarly-situated non-black employees who had no protected activity." *Id*. Defendant's argument, however, fails to view all facts and draw all inferences in the light most favorable to Plaintiff, as required at summary judgment. See *Majors*, 714 F.3d at 532-533. When the appropriate legal standard is applied, it is apparent that are myriad material facts in dispute that can only be resolved at trial.

14

### A.    Discrimination and Retaliation

"Section 1981 protects the right of all persons, regardless of race, to 'make and enforce contracts.'" *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 752 (7th Cir. 2018) (quoting 42 U.S.C. § 1981); see also *Morris v. BNSF Railway Co.*, 969 F.3d 753, 758 (7th Cir. 2020). To prevail on a § 1981 discrimination claim, a plaintiff must prove that "(1) he is a member of a racial minority; (2) [his employer] had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Elzeftawy v. Pernix Group, Inc.*, 477 F. Supp. 3d 734, 772 (N.D. Ill. 2020). Put more succinctly, "[the] legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises,* 834 F.3d 760 (7th Cir. 2016); see also *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020); *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020).

The Supreme Court recently clarified that to prevail on a § 1981 claim, a plaintiff "must initially plead and ultimately prove that, *but for* race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (U.S. 2020) (emphasis added); see also *Kilgore v. FedEx Freight*, 458 F. Supp. 3d 973, 978–79 (N.D. Ill. 2020); *Nelson v. Idleburg*, 2020 WL 2061555, at *5 (N.D. Ill. Apr. 29, 2020) (noting that "the Supreme Court recently held that a plaintiff alleging race discrimination in violation of Section 1981 must prove that race was the but-for cause of the alleged discrimination, which is a higher burden than Title VII's motivating factor test"). But the Court also recognized, in the context of Title VII, that "but-for" causation "can be a sweeping standard," as "[o]ften, events have multiple but-for causes." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739-1740

(U.S. 2020).[1] Thus, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Id*. at 1739. "So long as the plaintiff's [or membership in a protected class] was one but-for cause of that decision, that is enough to trigger the law." *Id*.

In determining whether Plaintiff's race caused his termination or any other adverse employment action, the Court is required to "assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*." *Tyburski*, 964 F.3d at 598 (quoting *Ortiz*, 834 F.3d at 765). "The determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Prof'l Reg.*, 988 F.3d 948, 958 (7th Cir. 2021) (quoting *Ortiz*, 834 F.3d at 765). "Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula," *Vega v. Chicago Park District*, 954 F.3d 996, 1004 (7th Cir. 2020), and considering direct and circumstantial evidence without differentiation. See *id*. ("[T]he fact that Vega relied mainly on circumstantial rather than direct evidence is of no moment. What matters is whether she presented enough evidence to allow the jury to find in her favor[.]"); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (recognizing that "[d]irect evidence—an overt admission of discriminatory intent—is rare").

Circumstantial evidence supporting a finding of causation might include, for example, "'suspicious timing, a pretextual explanation for the termination, and evidence that similarly

---

[1] Title VII provides two paths for liability: the "motivating factor" standard added to Title VII in 1991; and "the more traditional but-for causation standard that continues to afford a viable, if no longer exclusive, path to relief under Title VII."

situated employees were treated differently.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)). But "[t]his list is not exclusive, and an employee "can point to any 'other evidence from which an inference of discriminatory intent might be drawn.'" *Abrego*, 907 F.3d at 1015 (quoting *Gracia*, 842 F.3d at 1019).

Section 1981's protection of the right to make and enforce contracts "encompasses retaliation claims when an employer takes an adverse employment action against an employee for asserting rights protected by § 1981." *Id.* (citing *CBOCS West Inc. v. Humphries*, 553 U.S. 442, 446 (2008); *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 807 (7th Cir. 2014)). "To establish a prima facie case of retaliation under § 1981, "a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that there is a causal link between the two." *Oliver v. Joint Logistics Managers, Inc*., 893 F.3d 408, 413 (7th Cir. 2018) (citing *Lord v. High Voltage Software, Inc*., 839 F.3d 556, 563 (7th Cir. 2016)). Retaliation claims brought under § 1981 are analyzed in essentially the same way as discrimination claims. See *Rozumalski v. W.F. Baird & Associates, Ltd*., 937 F.3d 919, 924 (7th Cir. 2019) (applying *Ortiz*, 834 F.3d at 765-766, to a Title VII retaliation suit); *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (explaining that circumstantial evidence of retaliation includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action"). "The key question is whether a reasonable juror could conclude that there

was a causal link between the protected activity or status and the adverse action." *Id*. (citing *Ortiz*, 834 F.3d at 765–66).

Defendant urges the Court to first examine Plaintiff's discrimination and retaliation claims using the *McDonnell Douglas* framework, see [75] at 4-5, under which the plaintiff must show evidence that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Tyburski*, 964 F.3d at 598. The Court finds it unnecessary to use this alternative method of "culling the evidence," however, due to the strength of the evidence considered as a whole as set out in *Ortiz*. *Tyburski*, 964 F.3d at 598 ("A plaintiff may put forth and a court may analyze evidence using the *McDonnell Douglas* framework, but neither must do so").

The Court considers Plaintiff's discrimination and retaliation claims together (as Defendant does) because a reasonable jury could conclude that either, or both, Plaintiff's race and his protected activity (complaining about Newell's comment) caused his termination and other adverse employment actions. Construing all facts and drawing all reasonable inferences in the light most favorable to Plaintiff, *Majors*, 714 F.3d at 532-33, the summary judgment record shows the following:

From the beginning of his employment at IHC, Plaintiff was subjected to offensive racial comments from co-workers about his and his African American co-workers' race. Plaintiff's superintendent—Hill—was a participant, calling Johnson "LeBron" rather than his proper name, referring to African Americans as "coloreds" and "colored fellas", and joking about them "stealing [his] truck." See [74] at 16-18, [101] at 5-8. Plaintiff put up with this because he had a fear of being discharged for making a complaint. See [93] at 64; [101] at 9-10.

In late June 2016, Hill told Plaintiff that once the tunnel project would up, he would be moving to another project at Stickney. See [93] at 7-8. Johnson told him the same. See *id.* at 8. But that changed as soon as Plaintiff complained about Newell using the phrase "n****-rigged" in Plaintiff's presence to describe scaffolding that Plaintiff had just finished constructing. [101] at 10. Plaintiff met with Hill, Nielsen, and Johnson and explained what Newell said and why he found it offensive, and also detailed other examples of racial harassment, including someone writing "white power" on an African American employee's worksite. See *id.* at 13. Instead of responding with concern, however, Hill told Plaintiff that where he and Newell "come from we use that phrase (n*****-rigged) all the time." [101] at 12. Plaintiff states that he "was immediately troubled by Hill's comment and thought 'I should be concerned about this guy because if he's using this type of phrase all the time, I'm going to be out the door relatively quickly.'" *Id.* Newell admitted to saying what Plaintiff had reported, yet Newell received no discipline; he was merely required to sign a copy of IHC's anti-harassment policy. See [101] at 20. Rausch (IHC's Vice President of Operations and the person ultimately in charge of employee transfer and termination decisions) felt the situation was "handled." *Id.*

Immediately after Rausch made his decision, Hill took Plaintiff off concrete pours and assigned him more menial tasks, working alone. See [101] at 20; [93] at 19.[2] The day after Rausch made his decision, Johnson warned him that Hill and Nielsen were watching him. See [101] at 21; see also [93] at 56. Two days later, Johnson warned him that Newell and others had it "out for" him." *Id.*[3] Less than a month later, Hill made the decision to reduce his crew and told Rausch he

[2] Defendant points to some job records that it contends show otherwise, see [101] at 20-21, but Plaintiff's testimony to the contrary creates a material question of fact on this issue.

[3] Defendant objects that Johnson's alleged warnings are inadmissible "as there is no foundation that the comment was based on personal knowledge." [75] at 7. But the warnings detailed by Johnson were much more specific than the affidavit involved in the case on which Defendant relies, *Smith v. Illinois Dep't of*

planned to lay off Plaintiff. See [101] at 25. Hill did so despite his prior representations that Plaintiff would be kept on after the tunnel work wound down, and despite the fact that similarly situated non-African American and non-complaining laborers were not told they would be laid off and continued working for many months thereafter. On Plaintiff's last day at Stickney, Hill told Plaintiff, in a threatening tone, "If you had a problem, you should have talked to me first. You're going to be reporting to Adam Row, at I-55." [101] at 28-29.

Plaintiff was transferred to the I-55 project under superintendent Row, which had only short-term needs, even while new workers were hired at Stickney. See [101] at 24. Within a week, Row announced he was laying off workers. Though he told Plaintiff he wanted to and was trying to keep him employed, [93] at 31-32, Row nonetheless informed Plaintiff and none of the other laborers on the job that he would have to "sit a couple guys for a week or two." [101] at 30. The same day, Plaintiff was assigned a 17-hour double-shift, during which he was required to drill anchor bolts while suspended more than 30 feet in the air. See [93] at 32. Plaintiff injured himself as a result and, after taking a few days off to rest his back, returned to the I-55 project—with a

---

*Traportation*, 936 F.3d 554, 559 (7th Cir. 2019). There, the affiant claimed to have witnessed the plaintiff "being discriminated against on many different occasions by the department and its agents," but failed to identify "who discriminated, what they did, and when they did it." Johnson identified specific individuals and actions and his statements are provided context from the meeting that occurred just days earlier in the worksite trailer. The Court also notes that Johnson is one of Plaintiff's supervisors and therefore his alleged statements could be considered admissions of a party opponent, which would be admissible as nonhearsay. See, e.g., *Makowski v. SmithAmundsen LLC*, 662 F.3d 818 (7th Cir. 2011) (out-of-court statements employer's human resources director allegedly made to employee, telling employee that she was terminated because she was pregnant and took medical leave, and informing her of employer's discriminatory treatment toward other pregnant employees, fell within the scope of human resources director's employment, and were thus admissible as nonhearsay as a party admission); *Wold v. Fellows Corp.*, 987 F. Supp. 662, 666-67 (N.D. Ill. 1997) (former employee's testimony that his immediate supervisor had told him, when outlining reasons for his discharge, that higher-ranking company official wanted "young guy with fire coming out of his ass" was admissible, in former employee's ADEA action against his former employer, as admission by party-opponent).

doctor's note backing up his explanation to Row—only to be informed that he was laid off. See [101] at 31-32.

According to Plaintiff, Row did not inform him he was terminated; that was a decision that would have to be approved by Rausch. [101] at 17. Row also did not tell him that there were any problems with his performance or with him taking off work for his back injury (as other employees had done for a variety of reasons, see [92] at 22). Instead, Row "assured him that the reason he was being laid off was lack of work, and that he would be brought back in a 'few weeks' in the future when the work picked up." [93] at 36. Plaintiff did not discover that he had been terminated until he received a lawyer-drafted letter at the end of October informing him for the first time that his "unreliability and absences," rather than simply "lack of work" justified his layoff. [101] at 32. Rausch had to approve the decision to terminate Plaintiff and chose not to reassign him to a different project.

Viewing this record in light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff's race, his complaint to management, or both, caused his termination and other, less severe adverse employment actions: There is the "suspicious timing" of Plaintiff's transfer within weeks of complaining to management of Newell's use of an offensive racial slur, as well as his termination just few weeks after that. *Abrego*, 907 F.3d at 1015. There are "pretextual explanations" for Plaintiff's transfer and termination. *Id*. Hill and Row both claimed a lack of work, even though other employees were kept on and new employees hired. Defendant claimed Plaintiff was unreliable, even though Row never told Plaintiff this, Plaintiff had a doctor's note, and other employees missed work for a variety of reasons. There also is arguably more "smoking gun"-type evidence: Hill (Plaintiff's supervisor) using racially offensive language, condoning

Newell's use of the term "n*****-rigged" and acknowledging "we" use it all the time, and threatening Plaintiff on his last day at Stickney.

Defendant's arguments in support of summary judgment ignore factual disputes and ask the Court to draw inferences in its favor, rather than Plaintiff's, as required at summary judgment. *Majors*, 714 F.3d at 532-33. For instance, Defendant points out that Hill kept two Black laborers on his crew after terminating Plaintiff; argues that Hill was simply keeping his "best laborers," [75] at 6; asserts that Plaintiff was treated more favorably by being transferred to the I-55 project than five workers who were laid off from the Stickney tunnel crew without being transferred; and claims that "Rausch was not inclined to find Plaintiff work when Mr. Row was unhappy with him." [75] at 8. All this line of argumentation does, however, is introduce additional circumstantial evidence that will need to be sorted out at trial. Because the question of whether Defendant terminated Plaintiff (or took any other adverse action against him) because of his race and/or because he complained about Newell's use of the term "ni*****-rigged" cannot be resolved at summary judgment, Defendant's motion must be denied as to Plaintiff's § 1981 discrimination and retaliation claims.

## B. Hostile Work Environment

To succeed on a § 1981 hostile work environment claim, "a plaintiff must demonstrate that: (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). "The third element "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Grimes v. Cook County*, 455 F. Supp. 3d 630, 644 (N.D. Ill. 2020) (quoting *Vance v. Ball State Univ.*, 646 F.3d

461, 469 (7th Cir. 2011)). Thus, "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013).

"Whether conduct is 'sufficiently severe or pervasive to alter the conditions of employment' ... depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'" *Gates v. Board of Education of the City of Chicago*, 916 F.3d 631, 640 (7th Cir. 2019) (quoting *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 900 (7th Cir. 2018)); see also *Grimes*, 455 F. Supp. 3d at 644. "If a plaintiff claims that he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach, all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive." *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1044–45 (7th Cir. 2000). In general, "a supervisor's use of racially toxic language in the workplace" is treated "as much more serious than a co-worker's." *Gates*, 916 F.3d at 638. "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 900–01. "If a reasonable jury could find that the conduct was severe or pervasive, then the claim must go to trial." *Gates*, 916 F.3d at 640.

Defendant concedes for purposes of summary judgment that all the race-based comments alleged by Plaintiff occurred and that Plaintiff perceived the comments as offensive. See [75] at 9. Nonetheless, Defendant argues, "summary judgment is appropriate as Plaintiff cannot demonstrate severe or pervasive harassment which altered the conditions of his employment, and there is no basis for employer liability." *Id*. Defendant asserts that the Court should disregard as

23

irrelevant comments that are not based on race—in particular two ironworkers telling Plaintiff, "you're my favorite one," and his co-worker Scotty taunting him with "F*** that black dude, I really want to f*** that black dude" while Plaintiff was on a catwalk, as well as comments that purportedly were not made with racial animus, such as Shane using the term "n*****-rich" in Plaintiff's presence. [75] at 10, 11.

However, Plaintiff perceived these comments to be offensive and race-based and there is nothing about their nature, or the case law cited by Defendant, that suggests the Court must disregard them as a matter of law. More fundamentally, the Supreme Court has cautioned that "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason*, 233 F.3d at 1045. That said, "[i]f a plaintiff pursues a hostile work environment claim based on the behavior of a supervisor, evidence of harassment by a coworker logically must be tied somehow to the supervisor for it to be relevant and admissible." *Id*.

As Defendant characterizes the case, Plaintiff's hostile work environment claim is "based primarily on 'second-hand' harassment, the comments directed to the plaintiff were merely offensive, and the plaintiff had no evidence that the harassment interfered with his work performance." [75] at 14. But, as Plaintiff points out, Defendant "improperly focuses only on comments rather than IHC's racially hostile actions, which included denying [Plaintiff] overtime, assigning him to menial tasks, transferring him from Stickney and laying him off." [92] at 28. If Plaintiff's claim involved merely offensive comments, made primarily by his co-workers and not directed at him, the Court might agree with Defendant that summary judgment is proper—especially as Plaintiff did not complain to management about any of the comments made in his first year of employment, giving them no opportunity to address the situation. See generally *Isaacs*

*v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) ("employers are not vicariously responsible for misconduct in the workplace; employers are responsible for their own conduct (or omissions)—which is to say, for how they respond (or fail to respond) after receiving notice that an employee may be suffering from disparate treatment at co-workers' hands"). The Court "assume[s] employees are generally mature individuals with the thick skin that comes from living in the modern world." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). "As a result, employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).

However, the evidence of harassment here includes more than off-color comments or isolated instances. The Court must consider "the totality of [Hill's] conduct"; "separating some of the conduct out into retaliation instead of including it as part of the harassment" would be error. *Robinson*, 894 F.3d at 829-30. When all the alleged statements and actions are considered together, see *id.*, it is apparent that Plaintiff's hostile work environment claim also must go to trial. Construing all facts and drawing all reasonable inferences in the light most favorable to Plaintiff, the summary judgment record shows the following:

After Plaintiff endured a year of racially offensive conduct by his co-workers—as well as his supervisor, Hill, referring to him and other African American co-workers as "colored" and to LaSean as "Lebron"—he reached his limit when Newell described scaffolding that he had just built as "n*****-rigged." He reported the incident to his supervisors, even though he feared being discharged for making a complaint. But they did not punish Newell. Instead, Hill reacted in a manner that arguably condoned Newell's behavior, explaining that where he and Newell "come from we use that phrase all the time." [101] at 12.

Immediately, Hill began acting in ways that interfered with Plaintiff's work performance, see *Gates*, 916 F.3d at 640: denying him overtime opportunities that he otherwise would have received; assigning him more menial tasks rather than pouring concrete; and laying him off despite earlier representations that he would stay on at Stickney after the tunnel project wound down. While Defendant denies that Plaintiff actually received less overtime or more menial tasks after he complained, the record on these points is disputed and cannot be resolved at summary judgment. Further, it is undisputed that Hill decided to lay off Plaintiff, despite prior representations that he would have a place at Stickney once the tunnel project would down, and despite keeping on Plaintiff's co-workers. While the offensive language directed at and used around Plaintiff in this case may not be as pervasive or offensive as in some cases that have survived summary judgment, the manner in which the harassment interfered with Plaintiff's ability to work convinces the Court that summary judgment would be inappropriate. See, e.g., *Robinson*, 894 F.3d at 828-30 (genuine issue of material fact existed as to whether supervisor's alleged harassment of African-American police officer employed by university, including multiple uses of the racial epithet "n*****" and heightened scrutiny of his work, was severe or pervasive, precluding summary judgment on officer's Title VII hostile work environment claim); *Gates*, 916 F.3d at 632-33 (supervisor's use of racist slur and threats to write up his "black ass" could support finding of race-based harassment even though the supervisor's "conduct was relatively infrequent and not 'physically threatening' or 'humiliating'").

Finally, Defendant is not entitled to summary judgment on the issue of whether there is a basis for imposing liability on Defendant for its employees' actions. As Defendant acknowledges in its reply brief, [102] at 23, the *Ellerth* affirmative defense does not apply where a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or

undesirable reassignment." *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000); see also *Vance*, 570 U.S. at 428–29; *Passananti*, 689 F.3d at 670 ("When no tangible employment action is taken against the employee in the course of the harassment, an employer may raise an affirmative defense to liability that must be proved by a preponderance of the evidence." (citing *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 765 (1998))).  According to Defendant, "Plaintiff does not claim [Defendant's adverse employment] actions occurred as part of the harassment."  [102] at 23.  But that is exactly what Plaintiff claims.  See [92] at 28 ("IHC improperly focuses only on comments rather than IHC's racially hostile actions, which included denying Myers overtime, assigning him to menial tasks, transferring him from Stickney and laying him off.").

For these reasons, Defendant is not entitled to summary judgment on Plaintiff's hostile work environment claim.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [73] is denied.  This case is set for a telephonic status hearing on April 14, 2021 at 9:45 a.m.  Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.


Dated: March 29, 2020

_____
Robert M. Dow, Jr.
United States District Judge